HON. GEORGE A. BRAYTON, CHIEF JUSTICE.
HON. THOMAS DURFEE, ASSOCIATE JUSTICE.

---

## STATE *v.* JOB A. PECKHAM, and others.

Where the defendants were convicted upon an indictment for an obstruction of a certain common and public highway and landing place in the town of P., commonly known and called by the name of the Common, lying west of the highway leading through a portion of said P., from the town of M., to Bristol Ferry, so called, and extending from said highway to the shore in a westerly direction, *held,* that a conviction could not be sustained where all the evidence offered was of the obstruction of a common which lies to the northwest and north of such highway, there being, in such case, a fatal variance between the proofs and the indictment, as to the locus.

A highway, strictly speaking, connects with a ferry only at the water's edge, and an open space between the termination of the highway and the water, cannot be presumed to go by the name of Bristol Ferry, in the absence of positive proof.

Evidence was offered, showing that the committee appointed by the town of P., to divide the undivided lands of the town, made a report of their action to the town, giving a list of highways which, in making their division, they had laid out for the convenience of the public, using the following language describing what is now the common at Bristol Ferry: "And the piece of land near Abiel Tripp's house adjoining to the Ferry against Bristol, is left for the convenience of the public in importing and transporting cattle, &c., "and is bounded," &c., and also evidence was offered showing that the town voted "that all of such high roads, highways, lanes and drift-ways in this township, as are set forth in a list of the same," &c., (meaning thereby the list mentioned by said committee,) are allowed and confirmed." *Held,* sufficient evidence to show a valid lay-out of said common at Bristol Ferry as a public highway.

In considering the evidence of the lay-out of a public highway, a plat made by the committee appointed to divide the undivided lands of the town, and deeds made by them to individuals, of lands on the east and west side of said highway, are not to be preferred to the report afterwards made by said committee, as evidence of their action, merely because they were recorded before the report was made.

Where the public are entitled to an easement in certain premises, either as a common, a highway, or landing place, the town in which said premises are situated has no authority to bind the public in regard to the extent of such easement by submission to arbitration.

AT the October term of the Court of Common Pleas, 1858, for the County of Newport, Job A Peckham, Henry Bull and Joseph I. Bailey, were indicted on an indictment preferred by Jerome B. Kimball, Esq., Attorney General, for obstructing a certain common and public highway and landing place in the town of Portsmouth, known and called by the name of the Common. The indictment charged, "that there is now, and long before, and at the time of the obstruction and nuisance hereinafter mentioned, there was a certain common and public highway and landing place in the town of Portsmouth, in the aforesaid county of Newport, commonly known and called by the name of the Common, *lying west of the highway leading through a portion of said Portsmouth, from the town of Middletown in said county, to Bristol Ferry, so called, and extending from said highway to the shore in a westerly direction,* for all the citizens of said State to go, return, pass and repass, in and along the same, at their will and pleasure, and to load and unload from and into ships, vessels and boats lying in the waters adjoining said common and public highway and landing place, cattle, sheep, horses, wood, rails and other articles of merchandize, at their

aforesaid free will and pleasure.   And the towns aforesaid, upon their oaths aforesaid do further present, that Job A. Peckham, Henry Bull and Joseph I. Bailey, all of Newport, in the afore-said County of Newport, traders alias gentlemen, on the first day of October, A. D., 1857, did unlawfully and injuriously erect and build and cause to be erected and built, a certain wooden fence of the height of four feet, in and upon a certain part of the aforesaid common and public highway and landing place, to wit, eight rods in length of said common and public highway, and landing place, and the said wooden fence so as aforesaid erected and built, in and upon the aforesaid part of the said common and public highway and landing place, they the said Job A. Peckham, Henry Bull and Joseph I. Bailey, from the said first day of October, in the year last aforesaid, until the day of the finding of this indictment, at Portsmouth aforesaid in the aforesaid County of Newport, unlawfully and injuriously did continue, keep and maintain, whereby the aforesaid com-mon and public highway and landing place hath been, for and during all the time aforesaid, and still is, greatly obstructed," &c.

At the trial before Mr. Justice Shearman at the October term, 1859, of the Court of Common Pleas for said county, four ex-ceptions were taken to the charge made by his Honor to the jury.

1. It appeared from the evidence adduced, and from the plats put into the case, that the highway leading from Middle-town to Bristol Ferry ran about due north and south, until it reached a point designated on the plat as Borden's corner, and that to the northwest of said Borden's corner was an open space designated as the Common at Bristol Ferry, extending to the water's edge.   The Common was used as a highway by the public through its whole extent, down to the water's edge, some twenty rods northwesterly from said Borden's corner.   The de-fendants were indicted for obstructing "a certain common and public highway, lying west of the highway leading through a portion of said Portsmouth from the town of Middletown in said county to Bristol Ferry, so called, and extending from said highway to the shore in a westerly direction."

The defendants asked the court·to charge the jury, that if the Common alleged to be obstructed was alleged in the indictment to be situated on the westerly side of the highway referred to in the indictment, and if there was no evidence of an obstruction of any common on the west side of the highway, and if all the evidence in the case was adduced in reference to a common on the east and ·northeast of the highway, they must find for the defendants. The judge refused so to charge, and stated to the jury, in effect, that it was immaterial whether the common obstructed was situated on one side or the other of the highway.

2. There was introduced into the cause a vote of the town of Portsmouth, appointing a committee in March, 1714, to di. vide the common or undivided lands in said town forthwith, laying out the same to such and so many freeholders as the committee should judge had a just right thereunto. Said committee conveyed a large number of parcels of land from time to time, and made a report Aug. 30, 1717, describing particularly a long list of highways, and continue their report as follows: " The King's high road on the west side of the island, in said township, which leads from the dividing line between Newport and Portsmouth in Rhode Island, is four rods in breadth from said line to the northwest corner of Thomas Manchester's orchard, and from said orchard corner to Manchester's bars, to the northward of the brook is left four rods and a half in breadth for the conveniency of a watering place for the use of the town, and from said bars along said road to the northeast corner of Thomas Borden's wall, opposite to John Earl's house, is or ought to be four rods in breadth—and the piece of land near Abiel Tripp's house adjoining to the ferry against Bristol, is left for the convenience of the public in importing and transporting of cattle, sheep, horses, wood, rails, &c., and is bounded on the bank against the salt water twelve rods, and against the land of John Earle, Jr., John Tripp and Abiel Tripp, that is from the said Earle, Jr's., his corner, so athwart Thomas Borden's northeast corner aforesaid, is twenty rods, and from Borden's corner down to the edge of the bank next to the salt water is nineteen rods." Upon this report it was voted, " that all of the high roads,

highways, lanes and driftways in this township as are set forth in a list of the same in the 63d, 64th and 65th pages in this book are allowed and confirmed by the free vote of the free inhabitants of this town, for the benefit of his majesty's subjects to pass and repass with carts, horse-wagons, or any other carriages whatsoever, excepting only the lane between the land of Thomas Hicks and Joseph Anthony mentioned in said list."

The defendants asked the court to charge the jury that this evidence was insufficient to prove a valid layout of a public landing place or common, but the court refused so to charge, and charged the jury in effect, that the evidence was sufficient to establish such a layout.

3. The aforesaid committee made a plat of the Common aforesaid and adjoining lands, which was recorded May 28th, 1714. They also made deeds of the land on either side of the alleged common, which were also recorded before the report of the committee was made, setting forth the dimensions of the Common, in 1717. The defendants asked the court to charge the jury that said plat and deeds should be preferred to the said report as evidence of the action of said committee in the matters to which they related, because recorded before the report was made, but the judge refused so to charge, and charged that the deeds, plat and report should be considered together, and that the jury should find a result from the entire evidence.

4. The town of Portsmouth and the abutting proprietors having submitted the question of the extent of the common to arbitration and award, the defendants asked the court to charge, that the award made by the referees so chosen was binding upon the town of Portsmouth and upon the State. The judge refused so to charge, but charged the jury that the submission and award made upon the agreement between the town of Portsmouth and the defendants, were not binding upon the public or upon the State.

To all these rulings and refusals to rule, the defendants excepted, and the exceptions were argued in writing by *Sheffield*, for the defendants, and by the Attorney General, *Horatio Rogers, Jr., Esq.*, for the State.

*Sheffield, for the defendants :*—

I. The first question is that of the variance between the proofs and the indictment, as to the description of the *locus in quo.* In criminal cases, *description* is either a matter of venue or of the essence of the offence. This indictment was for obstructing a *particular* highway, common and public landing place, which is attempted to be *particularly* described in the indictment. So the action is local in its character, made so especially by the mode in which it is described. In local actions, allegation of place is material and must be strictly proved if put in issue. 1 Greenleaf's Ev. § 62, Roscoe's Crim. Ev. 103, and n. 1, 111 and 112. The rule is the same in criminal as in civil cases. 1 Greenleaf's Ev. § 65. If the offence is described with unnecessary particularity, the particular description must nevertheless be proved. 1 Greenleaf's Ev. § 61. *United States v. Porter*, 3 Day, 283.

II. The committee appointed by the town of Portsmouth, in the year 1714, had no authority to lay out a common. The plat offered in this case, though made by John Mumford, Surveyor, purports upon its face to have been made by order of the committee, and as there is manifestly a variance between the plat and the report which was made some three years subsequent to the plat, the latter, because it was made by the surveyor and upon the ground, would be much more liable to be correct than a report of that survey made three years afterwards, and at all events, records have priority according to their date.

III. The plat made by the Committee was made out and recorded by May 28, 1714. The deeds conveying the land on either side of the alleged common were recorded, and the rights of the proprietors adjoining to the common were fixed, before the report of the committee setting forth the dimensions of the common in 1717. A prior record complete in itself should be permitted to have complete effect, and a subsequent record made by the same grantor should not be permitted to qualify it.

IV. The fee of this common being in the town of Portsmouth, it was competent for that town to submit the question of the extent of the " common" as it was laid out, to arbitration

and award, and in the manner and form in which it was sub-
mitted by the town of Portsmouth and the abutting proprietors
to referees. Their award was not only binding upon the town
and the abutting proprietors as to the extent of the alleged
common as it was laid out, (if it was laid out at all) but also
upon those who had easements out of that original common.
The public had at most but an easement in this parcel of land.
The fee, the greater estate, was in the town. The mere incident
to the fee was limited by the fee irself.

*Horatio Rogers, Jr., Attorney General, for the State:—*

I. The common and public highway and landing place which
is alleged (in a certain part of it) to have been obstructed, is not
the highway that leads from Middletown to Bristol Ferry, but a
different one, namely, one that extends from said last mentioned
highway, westerly to the shore. The highway leading from
Middletown through Portsmouth to Bristol Ferry, *terminates* at
" Borden's corner" and at this terminus commences the " Com-
mon" or the *common public highway and landing place*, a portion
of which is alleged to have been obstructed. The fence is nei-
ther north, south, east nor west of the highway and landing-
place alleged to be obstructed, but is *on* it, and the plat and
proofs show conclusively that the obstructed highway extends
westerly to the shore from the highway terminating at Borden's
corner.

II. The term common is a name, an appellation, applied to
the *locus in quo* since it was laid out, to designate it from other
highways, as the term Market Square is applied to a highway
in the City of Providence, laid out as a highway and not as a
market. It was set apart for the convenience of the public and
not of the town merely, and that makes it a highway, after
being approved and confirmed as such by the town, as this one
was. If a highway extends to tide-water, as it clearly does in
this case, then the public have a landing place, but whatever
else the *locus* may be, it is clearly laid out as a highway.

III. In establishing a layout, the report of the Committee
making it is the very essence of it, and to virtually exclude
that report would be to deny the layout. If there was any

error on the part of the committee, the whole evidence should be taken together, that the jury may decide.

IV.   After a highway has been dedicated or laid out, and accepted or confirmed as such, the owner of the fee has no power to affect the boundary of the highway.   His sole right in the land is in the reversion after it shall be abandoned as a highway, and it makes no difference whether an individual or a town is the owner of that reversion.   *Angell and Durfee on Highways,* §§ 167, 168, 321.   The only manner in which a town can affect a highway is by declaring it useless.

DURFEE, J.   1.   The *locus* of the alleged nuisance is described in the indictment as "a certain common and public highway and landing place in the town of Portsmouth, in the aforesaid county of Newport, commonly known and called by the name of the Common, lying west of the highway leading through a portion of said Portsmouth from the town of Middletown, in said county, to Bristol Ferry, so called, and extending from said highway to the shore, in a westerly direction."

The Attorney General claims that this description is correct, according to the plat and documentary proofs in the case, and, consequently, that the defendants should not have a new trial under their first exception.   He claims that the highway referred to as "leading through a portion of said Portsmouth," &c., terminates at a point designated on the plat as "Borden's Corner," and that thence "extending to the shore in a westerly direction," is "the common and public highway and landing place," mentioned in the indictment.

This view presents two difficulties.   First, a highway terminating at "Borden's Corner," is not ostensibly a highway leading to Bristol Ferry ; for, strictly speaking, a highway connects with a ferry only at the water's edge, and Borden's Corner is some distance from the water.   It may be, that the open space between "Borden's Corner" and the water goes by the name of Bristol Ferry : but if so, it is not a fact which is apparent on the record before us, and, therefore, not a fact of which we can have judicial knowledge.   Second. The area marked on the plat as "Common at Bristol Ferry," does not lie *West* of the

highway, even if Borden's Corner could be taken as its termi-
nus, nor does it extend precisely in a westerly direction, but
rather in a direction between northwest and north, from such
terminus to the shore. Therefore, we cannot overrule the first
exception, without straining both these points in favor of the
State. This we do not feel at liberty to do, and must therefore
sustain the first exception, and grant the defendants a new trial.

For the guidance of the court in any new trial which may
be had, we will also express our opinion on the other questions
raised by the exceptions.

2. We think the ruling covered by the second exception
was correct. The committee appointed to divide the undivided
lands in Portsmouth, as stated in the exception and documents
referred to, made report of their action to the town, giving
therein a list of highways, which, in making the division, they
had laid out for the convenience of the public.

In the list the committee use the following language, describ-
ing what is now called the Common at Bristol Ferry, to wit.,
" And the piece of land near Abiel Tripp's house, adjoining to
the ferry against Bristol, is left for the convenience of the pub-
lic, in importing and transporting of cattle, sheep, horses, wood,
rails, &c., and is bounded," &c. On this report the town voted,
" That all of the high road, highways, lanes and driftways in
the township, as are set forth in a list of the same in the 63d,
64th and 65th pages in this book, (meaning thereby the list
aforementioned,) are allowed and confirmed,"—with the excep-
tion of a lane expressly named.

Neither the vote nor the report make mention of any com-
mon or landing place by name, but inasmuch as the locality
now known as the " Common at Bristol Ferry " was included by
the committee in their list of highways, we have no doubt that
it was understood and intended to be likewise included in the
allowance and confirmation of that list, by the vote of the free-
men of the town.

3. The third exception is not entirely clear in its meaning.
If it means, as we understand it to mean, that the plat and
deeds are to be preferred to the report as evidence of the action

of the committee in the matters to which they relate, merely because they were recorded before the report was made, we do not think the exception well taken; if it rests on other grounds, the defendants will have the benefit of another trial to bring those grounds more distinctly before the court.

4. We also overrule the fourth exception. If the public were entitled to an easement in the *locus in quo,* either as a common, a highway or a landing-place, the town had no authority to bind the public in regard to the extent of such easement, by submission to arbitration.

*New trial granted.*